IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


RAYMOND JAMES TRUST, N.A., TRUSTEE
OF E.C. CARE TRUST, A LOUISIANA TRUST                    PLAINTIFF

v.                              CIVIL ACTION NO: 5:19-CV-103-DCB-MTP

NATCHEZ HOSPITAL COMPANY, LLC d/b/a
MERIT HEALTH NATCHEZ (NHC) formerly
d/b/a NATCHEZ REGIONAL MEDICAL
CENTER, formerly NATCHEZ COMMUNITY
HOSPITAL, L.L.C., MELISSA JONES, M.D.,
JENNIFER RUSS, M.D., DANITA WEARY, M.D.,
BONNIE VINES, R.N., LAURA USNIK, R.N.,
PATRICIA CALVIN, R.N., AND JOHN AND
JANE DOES A; B; C; D; and E                             DEFENDANTS


ORDER AND MEMORANDUM OPINION


    This matter is before the Court on a Motion for Partial

Summary Judgment Regarding 100% Positive Pressure Ventilation

[ECF No. 138](the "Motion") filed by Defendants Natchez Hospital

Company, LLC d/b/a Merit Health Natchez (NHC) formerly d/b/a

Natchez Regional Medical Center, formerly d/b/a Natchez

Community Hospital, L.L.C. (the "Hospital"), Bonnie Vines, R.N.,

Patricia Calvin, R.N., and Laura Usnik, R.N. (collectively, the

"Moving Defendants").  Defendant Danita Weary, M.D. ("Dr.

Weary") has not joined this Motion.  The Moving Defendants and

Dr. Weary are referred to collectively herein as the

"Defendants".  The Court having examined the Motion, the

1

parties' submissions, the record, and the applicable legal authority, and being informed in the premises, finds as follows:

<u>Background</u>

On October 15, 2019, Raymond James Trust, N.A., Trustee of E.C. Care Trust, a Louisiana Trust ("Plaintiff"), filed this action against Defendants.  [ECF No. 1].  Plaintiff alleges, among other things, negligence, breaches of the standard of care, and failure to supervise during and after delivery of the infant, E.C., which, according to the Complaint, caused E.C. to suffer a grave brain injury.  <u>Id.</u> ¶ 39.  Plaintiff further alleges that, at birth, E.C. was a severely acidotic, oxygen deprived, hypoxic baby who was not breathing.  <u>Id.</u> ¶ 23.  E.C. required resuscitation with oxygen until she was 14 minutes of age.  <u>Id.</u> ¶ 25.  As described in the Moving Defendants' Memorandum in support of their Motion [ECF No. 139] (the "Memorandum"), "[n]urses resuscitated E.C. using, in relevant part, positive pressure ventilation[1] with 100% oxygen." Memorandum at 2.

---

[1] Positive pressure ventilation, also known as "PPV", has been defined as:  "A form of artificial respiration in which gas with a high oxygen content is introduced into the lungs at a pressure which is higher than the atmospheric pressure exerted on the outer surface of the chest."  J. E. Schmidt, M.D., *Attorneys' Dictionary of Medicine,* LEXIS/Matthew Bender & Company, Inc. (August 2021).

The Moving Defendants ask this Court to "[d]ismiss Plaintiff's claim … that resuscitating E.C. with 100% oxygen aggravated her brain injury", Motion at 1, because "Plaintiff's experts fail to demonstrate that [using 100% oxygen] proximately caused injury to E.C." Memorandum at 2. In the alternative, the Moving Defendants challenge the testimony of Plaintiff's experts, Drs. Inder and Glass, under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and ask this Court to exclude from the experts' testimony "any statements that resuscitating E.C. with 100% oxygen aggravated her brain injury." Memorandum at 8.

Plaintiff counters that there is sufficient evidence to establish causation, [ECF No. 157] ("Opposition") at 9, an essential element of Plaintiff's medical malpractice case, and that its experts established "the causal connection between the negligent administration of 100% PPV and E.C.'s brain injury." Id. at 21; see also deposition testimony of Danita R. Weary, M.D., 79:8-14, [ECF No. 157-3] at 2.[2] With respect to the Moving

---

[2] Dr. Weary testified in part:

Q. Okay. Have you seen some literature -- are you aware that using 100 percent oxygen can actually be harmful to the baby?
A. Can be harmful, yes.
Q. And can be harmful to the brain cells?
A. Which is why we don't start with 100 percent oxygen usually.

Weary Dep. 79:8-14, [ECF No. 157-3] at 2.

Defendants' alternative argument, Plaintiff points out that
separate <u>Daubert</u> motions already are pending before the Court in
which the Defendants seek to exclude or limit the testimony of
Drs. Inder and Glass.   <u>Id.</u>

Summary Judgment Standard

Summary judgment is appropriate, pursuant to Rule 56 of the
Federal Rules of Civil Procedure, "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." FED. R. CIV.
P. 56(a).  An issue of material fact is genuine if a reasonable
jury could return a verdict for the non-movant.  <u>Anderson v.
Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  "Factual disputes that
are irrelevant or unnecessary will not be counted."  <u>Id.</u>  A
party cannot defeat a properly-supported summary judgment motion
by directing the Court to conclusory allegations or presenting
only a scintilla of evidence.  <u>Lincoln v. Scott</u>, 887 F.3d 190,
195 (5th Cir. 2018).

The evidence must be reviewed in a light most favorable to
the nonmoving party.  <u>Vann v. City of Southaven, Miss.</u>, 884 F.3d
307, 309 (5th Cir. 2018); <u>Sierra Club, Inc. v. Sandy Creek
Energy Assocs., L.P.</u>, 627 F.3d 134, 138 (5th Cir. 2010).  The
Court neither assesses credibility nor weighs evidence at the
summary-judgment stage.  <u>Wells v. Minnesota Life Ins. Co.</u>, 885
F.3d 885, 889 (5th Cir. 2018).  Summary judgment must be

rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Discussion – Partial Summary Judgment

Under the substantive law of Mississippi, a plaintiff must establish three elements to prevail on a medical malpractice claim:

> (1) the existence of a duty by the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury;
>
> (2) a failure to conform to the required standard; and
>
> (3) an injury to the plaintiff proximately caused by the breach of such duty by the defendant.

Norman v. Anderson Reg'l Med. Ctr., 262 So.3d 520, 523 (Miss. 2019); Vaughn v. Miss. Baptist Med. Ctr., 20 So.3d 645, 650 (Miss. 2009); Hubbard v. Wansley, 954 So.2d 951, 956–57 (Miss. 2007); see also Massey v. United States, 565 F.App'x 326, 327–28 (5th Cir. 2014).

In their Memorandum, the Moving Defendants dispute the second element of Plaintiff's malpractice claim (i.e., whether "using 100% oxygen breached the standard of care", Memorandum at 2), but they focus their summary judgment efforts almost

exclusively on the third element – proximate cause.  Id. at 4-8.
The movants emphasize that Drs. Inder and Glass fail to discuss
in their respective expert reports "any basis in E.C.'s medical
record for claiming E.C. had hyperoxia."[3]  [ECF No. 174](the
"Rebuttal") at 4; see also Memorandum at 6-7.  According to the
movants, hyperoxia only can be proven by reference to E.C.'s
oxygen saturation levels, which they claim the experts fail to
do.  Memorandum at 7; Rebuttal at 4-5; but see deposition
testimony of Danita R. Weary, M.D., 84:9-22, [ECF No. 157-3] at
4, regarding additional assessments of oxygenation during the
administration of PPV.[4]  The movants conclude that:  "Inasmuch as
neither expert refers to E.C.'s oxygen saturation levels in

---

[3] Hyperoxia has been defined as:  A condition in which the body
has an excess of oxygen in the tissues and organs, usually as a
result of exposure to high oxygen concentrations. J. E. Schmidt,
M.D., *Attorneys' Dictionary of Medicine,* LEXIS/Matthew Bender &
Company, Inc. (August 2021).

[4] Dr. Weary testified in part:
Q. What are you doing additionally to monitor how oxygenated the
baby is while you are doing the PPV?
A. I'm assessing their color. I'm assessing if they are starting
to move. That let's me know that we are being -- we are being
effective. While I'm actually doing the PPV, I'm assessing chest
rise to make sure that we are actually getting air to go in and
out. So I'm looking at that while I'm doing my PPV.
Q. Do you have the child hooked up to any monitors?
A. We try to. From the time that we start we try to get a Sat
monitor and cardiopulmonary monitor set attached. So if I'm in
the OR or the labor room, I'm not going to have that. That is
another benefit to me of being in the actual nursery.

Weary Dep. 84:9-22, [ECF No. 157-3] at 4.

their respective reports, they have failed to demonstrate that
100% oxygen more probably than not caused harm."  Memorandum at
7-8.

After the Motion was filed, Dr. Inder submitted an
affidavit to her expert report in which she refers to certain
oxygen saturation levels from E.C.'s medical record at birth.
Affidavit of Terrie E. Inder, M.D., [ECF No. 157-4] at 13.  The
Moving Defendants recognize this supplemental information in
their Rebuttal:  "Dr. Inder's Affidavit mentions some, but not
all, of the oxygen saturation levels of E.C. during the time in
question."  Rebuttal at 4.  The Court is perplexed, however, by
the movants' claim that Dr. Inder's affidavit:

> "makes no mention whatsoever of subsequent saturation
> levels, including 88% at 2135 hours (11 minutes of
> life) minutes of life [sic] and 96-97% on room air
> after resuscitation ceased at 2138. (14 minutes of
> life)."

Rebuttal at 5.  To the contrary, Dr. Inder's affidavit takes
note of, and quotes, E.C.'s postnatal oxygen saturation level at
21:38 on March 24th ("Spontaneous resp effort noted at 21:38. O2
sat remained 96-97% on room air").  Inder Aff. [ECF No. 157-4]
at 14.  The affidavit further reproduces the electronic patient
record that presumably was entered by Nurse Hollowell,[5] including
the entry at 21:35:00 ("Newborn SpO2 (Left Foot): 83%").  Id. at

---

[5]  The "User" listed for each entry in the medical record excerpt
is Ann Hollowell, R.N.  [ECF No. 174-3].

15; see also medical record excerpt at [ECF No. 174-3].  Dr. Inder's consideration of E.C.'s oxygen saturation levels is further evidenced by paragraph 7 of her affidavit:  "Indeed, not only is the 100% oxygen unnecessary as [E.C.]'s oxygen saturations were appropriate or high but it has been shown to increase injury as previously outlined in my report."  Id.

Dr. Glass's commentary regarding the use of 100% oxygen is limited in comparison to other issues discussed in his report and affidavit, such as E.C.'s neonatal seizures.  He concludes in his report that the use of 100% oxygen "was not consistent with the nurses NRP training", [ECF No. 157-5] at 4, see notes 8 and 9 infra, and that "[i]nitiating positive pressure ventilation (PPV) with 100% oxygen in the nursery at 2126 also represents treatment that falls below the standard of care."  Id. at 11.  The Moving Defendants are correct that Dr. Glass does not cite to E.C.'s postnatal oxygen saturation levels in his report and affidavit.  Plaintiff counters that there is no basis in fact or law for the movants' contention that harm only can be shown by reference to oxygen saturation levels, which Plaintiff claims is nothing more than an argument created by lawyers.  Opposition at 3, 9, 16-17.[6]

---

[6] In its Opposition, Plaintiff purports to quote from page 5 of Dr. Inder's report, but the Court cannot find the quoted material on any page of Dr. Inder's report.  The source of the quoted material remains unclear to the Court, which is not

Having considered the parties' arguments and the evidence in a light most favorable to the nonmoving party, the Court is of the view that, if the Moving Defendants wish to challenge the experts' consideration of E.C.'s oxygen saturation levels and other facts and data underlying the experts' opinions, they should have sufficient opportunities to do so on cross-examination at trial.  United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi, 80 F.3d 1074, 1077 (5th Cir. 1996) ("'As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'")(quoting Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987); see also Federal Rule of Evidence 705.[7] The Moving Defendant's argument regarding a lack of express

---

helpful to the decision-making process.  Opposition at 17-18. See Bird v. Simpson Inv., 121 F.3d 705, n.10 (5th Cir. 1997)(Fifth Circuit cautions against inaccurate and misleading citations to the summary judgment record).

[7] Federal Rule of Evidence 705 provides:

Rule 705. Disclosing the Facts or Data Underlying an Expert. Unless the court orders otherwise, an expert may state an opinion — and give the reasons for it — without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.

Fed. R. Evid. 705.

references to oxygen saturation levels in the experts' reports falls short of persuading this Court to grant partial summary judgment.

Another area of contention in the parties' briefs is a factual debate that concerns whether the nurses initiated E.C.'s resuscitation at a 21% oxygen level (allegedly the correct initiation level according to the Neonatal Resuscitation Program[8] ("NRP")) or at 100%, which Plaintiff claims is a violation of the standard of care.  Opposition at 12; Rebuttal at 6-7; <u>see</u> <u>also</u> Hospital 30(b)(6) Dep. 82:6-83:6, [ECF No. 157-1] at 2-3.[9]

---

[8] The American Academy of Pediatrics administers NRP, and its website provides:  "The Neonatal Resuscitation Program® (NRP®) course conveys an evidence-based approach to care of the newborn at birth and facilitates effective team-based care for healthcare professionals who care for newborns at the time of delivery."  https://www.aap.org/en/learning/neonatal-resuscitation-program/; <u>see also</u> Affidavit of Terrie E. Inder, M.D., ¶ 8, [ECF No. 157-4] at 15-16.

[9] The Hospital's 30(b)(6) deponent testified in pertinent part:

Q. The nurses who are working in labor and delivery and in the nursery have to have NRP certificates?
A. Yes, sir.
Q. Do you expect them to follow the NRP guidelines?
A. Yes, sir.
Q. Do you know what you teach these nurses concerning how much oxygen to give a baby during PPV when the baby has a heart rate, but is not breathing?
A. That is all NRP.
Q. Do you know what the level is?
A. It starts at 21 percent and then based on the baby it goes from there. There is a chart that they use. I don't know it off the top of my head.
Q. You agree with me it should never start at one hundred percent when it's a term baby with a heart rate?

The Moving Defendants rely on the deposition testimony of a delivery nurse, Laura Usnik Long, R.N., and of a nursery room nurse, Ann Hollowell, R.N.  Both testified that E.C.'s resuscitation began in the delivery room.  Long Dep. 151:2-15, [ECF No. 174-1] at 4; Hollowell Dep. 37:14-15, [ECF No. 157-2] at 3.  In a separate affidavit made subsequent to her deposition testimony, Nurse Long stated under oath:  "Oxygen was originally administered to [E.C.] in the labor and delivery room.  The oxygen level for resuscitation of babies was always set at 21% in the labor and delivery room at Natchez Community Hospital.  This would have been the level at which [E.C.] originally received supplemental air."  Affidavit of Laura Usnik Long ¶ 3, [ECF No. 174-2] at 1-2.  Nurse Hollowell testified that she walked into the nursery when E.C. was about five minutes old, and the oxygen level for E.C.'s resuscitation was set at 100%.  Hollowell Dep. 36:15-37:2, [ECF No. 157-2] at 2-3.  Nurse

---

A. Right.
Q. And the reason for that is because it can damage the brain cells during their reperfusion process?
[Object to form.]
THE WITNESS:
   I know NRP teaches 21 percent, and that is what we all take.
Q. Do you know why they teach that?
A. Because of what you just said.

Hospital 30(b)(6) Dep., 82:6-83:6, [ECF No. 157-1] at 2-3.

Hollowell could not explain why it was set at 100%, and she confirmed that she would not have given oxygen to E.C. at that level. Id. 37:3-20, [ECF No. 157-2] at 3.[10]

The excerpt from the Hospital's electronic medical record that was submitted by the Moving Defendants, [ECF No. 174-3], and reproduced in Dr. Inder's affidavit, [ECF No. 157-4] at 15, documents E.C.'s birth on 3/24/2015 at 21:24:00 hours, with admission to the nursery two minutes later at 21:26:00 hours. The record also documents at 21:26:00: "Event: EP#4 Oxygen: Bag et mask ventilation with 100% O2 given."  Remarks entered into this record note that "Baby was given PPV in LDR." [ECF No. 174-3].  The medical record excerpt contains no mention of the level

---

[10] Nurse Hollowell testified in pertinent part:

Q. So what was the oxygen turned up to?
A. It was on a hundred percent.
Q. Do you know who turned it to a hundred percent?
A. No, I do not.
Q. Would you have done that?
A. I wouldn't have done it. It may have already been set on a hundred percent.
Q. Were you taught in your NRP program that for a full-term infant with a heart rate, you are not supposed to give a hundred percent oxygen?
A. We start out at room air.
…
Q. Why was this baby given a hundred percent oxygen when the baby was transferred to the nursery for resuscitation and the baby was full term and had a heartbeat?
A. I can't answer that.

Hollowell Dep. 37:1-20, [ECF No. 157-2] at 3.

of oxygen used to resuscitate E.C. in the delivery room, and the parties have not presented the Court with any medical record that documents the initial PPV oxygen level or the level(s) administered thereafter until 21:26:00.  In any event, on this record, the Court cannot be certain of: (1) the precise oxygen level used to resuscitate E.C. when PPV was first initiated or the levels used thereafter through her first two minutes of life; and (2) whether initiating PPV at a 21% oxygen level, and raising it two minutes later to 100%, would have any bearing on the opinions rendered by Drs. Inder and Glass.

In sum, having reviewed the record, including the expert opinions, deposition testimony provided to the Court, medical record, and submissions of the parties, the Court concludes that there may be facts for further development or clarification at trial and that the better course, at this time, is for the Court to refrain from granting partial summary judgment.

<u>Alternative Argument Under Daubert</u>

With respect to the Moving Defendant's alternative argument under <u>Daubert</u> to limit "Dr. Inder and Dr. Glass's testimony to exclude any statements that resuscitating E.C. with 100% oxygen aggravated her brain injury", Memorandum at 8, the Court notes that the Moving Defendants did not address the alternative argument in their Rebuttal.  This leads the Court to believe

that the Moving Defendants have abandoned their alternative argument.  The Court will nonetheless address it briefly.

In their alternative <u>Daubert</u> challenge, the Moving Defendants focus on an alleged failure of Drs. Inder and Glass to establish a causal connection between the use of "100% oxygen and E.C.'s oxygen saturation levels."  Memorandum at 8.  "[B]ecause the experts fail to make any reference to E.C.'s oxygen saturation levels in their opinions", <u>id.</u> at 8-9,[11] the Moving Defendants claim that the expert opinions are irrelevant, unreliable, "and should be struck."  <u>Id.</u> at 9.  In essence, the alternative argument mirrors the line of reasoning that the Moving Defendants presented to the Court in their primary argument for partial summary judgment.

The goal of <u>Daubert</u> is to "ensure the reliability and relevancy of expert testimony."  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).  The <u>Daubert</u> inquiry is flexible, <u>id.</u> at 150, and the district court's role is that of a gatekeeper only, limited to determining admissibility, not credibility, of the evidence.  <u>Pipitone v. Biomatrix, Inc.</u>, 288 F.3d 239, 250 (5th Cir. 2002)(the fact-finder is entitled to hear the expert's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on

---

[11] As discussed above, this statement is not accurate with respect to Dr. Inder's affidavit.

credibility, including whether the predicate facts on which the expert relied are accurate). The district court's "role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system." Scordill v. Louisville Ladder Group, L.L.C., 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596; see also 14.38 Acres of Land, 80 F.3d at 1077 (general rule is that questions relating to the bases and sources of an expert's opinion are left for the jury's consideration); Fed. R. Evid. 705.

At this stage of the litigation, the Court cannot find that the experts' opinions are so lacking in factual support as to be deemed unreliable or irrelevant. Given that the Moving Defendants' alternative argument essentially challenges whether the experts' opinions have an adequate factual basis, it would appear to this Court that cross-examination at trial will afford the Moving Defendants ample opportunity to develop their assertions. The Court therefore shall deny the Moving Defendants' alternative argument, but, subject to further factual development at trial, the Moving Defendants may seek to renew their objection at the appropriate time.

ACCORDINGLY,

IT IS HEREBY ORDERED AND ADUDGED that the Moving Defendants' Motion for Partial Summary Judgment Regarding 100% Positive Pressure Ventilation [ECF No. 138] is DENIED.

SO ORDERED AND ADJUDGED this 22nd day of September 2021.

　　　　　　　　　　　　　　　　　／s／　 David Bramlette
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE